# STATE OF MICHIGAN

# COURT OF APPEALS

KENNETH W. CONNERS,

Plaintiff-Appellant,

v

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY,

Defendant-Appellee.

UNPUBLISHED
October 6, 2016

No. 326465
Kalamazoo Circuit Court
LC No. 2013-000495-NF

BRONSON HEALTH CARE GROUP INC., d/b/a
BRONSON METHODIST HOSPITAL,

Plaintiff-Appellant,

v

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY,

Defendant-Appellee.

No. 326480
Kalamazoo Circuit Court
LC No. 2014-000117-NF

Before: STEPHENS, P.J., and BECKERING and GLEICHER, JJ.

GLEICHER, J. (*concurring in part and dissenting in part*).

Plaintiff Kenneth Conners' femur fractured when he was struck by a vehicle insured by defendant State Farm Mutual Automobile Insurance Company. Bronson Methodist Hospital personnel treated Conners for this injury. The majority holds that the circuit court erred by granting summary disposition to State Farm regarding personal injury protection (PIP) benefit claims for two complications of Conners' fracture: its nonunion, and Conners' altered mental status and fever following surgery for the nonunion. I fully concur that the circuit court's entry of summary disposition in favor of State Farm was inappropriate as to these benefits. I depart from the majority with regard to what happens next.

According to the majority, a jury must decide whether defendant State Farm is obligated to pay the disputed PIP benefits. I respectfully suggest that because the majority has analyzed

-1-

the legal question from an incorrect statutory perspective, it has reached an incorrect conclusion. In my view, State Farm has failed to raise a triable issue regarding its liability for the contested benefits. I would hold that summary disposition is required in plaintiff's favor.

I

A car driven by Paul Rojas, a State Farm insured, struck 53-year-old Kenneth Conners. An ambulance took Conners to Bronson Hospital, where an emergency room physician documented:

> P[atien]t was standing in the street and was hit on the right side by a car at low speeds [sic]. P[atien]t was thrown onto hood of the car. P[atien]t complaining of right hip and knee pain. P[atien]t states right hip pain is severe and sharp. *He was not able to get up or ambulate after injury.* [Emphasis added].

X-rays of Conners' pelvis and hip were reviewed by Dr. David Rockwell, a radiologist. The hip x-rays demonstrated "a fracture of the proximal right femur . . . immediately below each of the trochanters, the distal fracture fragment is moderately retracted[.]" The pelvis film similarly revealed "a fracture of the proximal right femur immediately below each of the trochanters." Dr. Campbell noted on his pelvis film report that "the age of this fracture is indeterminate. The fracture margins look somewhat smooth. However, on comparison hip films from the same day, the fracture would appear to be more acute, the margins slightly more irregular and sharp bend is suggested on the current study."

One day later, Dr. Joseph Ellwitz, a Bronson orthopedic surgeon, surgically repaired the fracture by implanting a plate and screws. Counsel for State Farm questioned Dr. Ellwitz during a deposition regarding the age of Conners' fracture. Dr. Ellwitz reviewed the films and opined: "there's no way to determine the date of a fracture by an x-ray, but there's no doubt that it's an acute fracture." An "acute fracture," he continued, is one that had occurred within the preceding four to five weeks. On redirect examination, Conners' attorney elicited the following testimony:

> *Q*. When you performed the surgery on October 26, 2013, you were able to observe the fracture in Mr. Conners' hip?
>
> *A*. Yes.
>
> *Q*. Would it have been possible for him to walk with that fracture?
>
> *A*. No.
>
> *Q*. So is it safe to conclude that if he was - - at any time he was able to walk, he did not have that fracture.
>
> *A*. Correct.

Given that a motor vehicle struck Conners when Conners walked into the street (an undisputed fact), Conners was unable to walk after this accident (an undisputed fact), and his treating physician testified that based on the appearance of the bone fragments, it would not have

been possible to walk on the fracture (an undisputed fact), there is no question but that Conners' intertrochanteric fracture arose from his collision with Rojas's car. State Farm recognized this reality when it elected to pay Conners' medical expenses for the initial surgery to repair the fracture. The State Farm adjuster noted that she had reviewed the medical records "including the 10/25/13 [sic] x-ray regarding the fracture being undeterminate [sic] however the x-ray taken earlier in the day appears acute." The note continues: "we have prior medical records dating back to 2008 and there is no mention of prior hip fracture." Payment followed.[1]

Thus, despite Dr. Rockwell's dictated statement that "the age of this fracture appears indeterminate," State Farm could find no evidence refuting that Conners' intertrochanteric fracture arose from Rojas' use of his motor vehicle as a motor vehicle. Nor has any such evidence surfaced in the interim. No material question of fact exists regarding the relationship between Conners' right intertrochanteric hip fracture and the automobile accident that brought him to Bronson Hospital. To repeat: Conners' intertrochanteric fracture resulted from a motor vehicle accident.[2]

---

[1] State Farm also questioned the relationship between the accident and the fracture based on the low speed of Rojas's vehicle at the moment it impacted Conners. Had State Farm done any medical research, however, it would have learned that intertrochanteric fractures commonly result from low-energy mechanisms in people whose medical conditions resemble Conners':

> Intertrochanteric (IT) femur fractures comprise approximately ½ of all hip fractures caused by a low-energy mechanism such as a fall from standing height. These fragility hip fractures occur in a characteristic population with risk factors including increasing age, female gender, osteoporosis, a history of falls, and gait abnormalities. Surgery is almost always the recommended treatment as the morbidity and mortality associated with nonoperative treatment historically have been high. Patients often have preexisting comorbidities that dictate the ultimate outcome. [Ahn & Bernstein, *Fractures In Brief: Intertrochanteric Hip Fractures*, 468(5) Clinical Orthopaedics & Related Research 1450-1452 (May 2010), available at <http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2853662/> (accessed August 30, 2016).]

[2] State Farm's inability to disprove the relationship between the fracture and the accident was not for lack of trying. Two retained physicians submitted a total of four affidavits addressing this issue. The best they could collectively come up with were allegations that: "An intertrochanteric fracture of the hip in an otherwise reasonably healthy, middle-aged man is not a common injury;" (2) "[A]lthough possible, it is not likely that a significant intratrochanteric [sic] fracture could occur simply by being bumped by a motor vehicle traveling 10 miles per hour or less;" and (3) "[T]hese radiographs are very suspicious to me that this is not an acute fracture." No evidence of record supports that Conners is "otherwise reasonably healthy," eliminating the foundation for this aspect of the State Farm expert's opinion. Nor do the other speculative expressions of doubt concerning the fracture's origins rise to the level of an admissible expert opinion.

This fact is significant because Conners' eligibility for first party no-fault benefits depends on whether he suffered an accidental bodily injury arising out of the use of a motor vehicle. MCL 500.3105(1) provides in relevant part:

> Under personal protection insurance an insurer is liable to pay benefits for accidental bodily injury *arising out of* the ownership, operation, maintenance or use of a motor vehicle as a motor vehicle, subject to the provisions of this chapter. [Emphasis added.]

Because Conners' intertrochanteric fracture arose out of the use of a motor vehicle as a motor vehicle, he is entitled to PIP benefits for the treatment of that injury. The question that necessarily follows is whether the no-fault act requires that State Farm pay medical benefits for treatment of Conners' fracture's nonunion and complications related to surgery on the nonunion. In my view, the answer to this question resides in MCL 500.3107(1) rather than in § 3105(1). Viewed through the lens of § 3107(1), summary disposition in favor of Bronson and Conners is in order.

II

In reviewing Conners' medical records, State Farm learned that Conners was not an ordinary or an ideal patient. He has a lengthy psychiatric history including possible schizophrenia, and suffers from a number of chronic medical conditions including hypertension, hepatitis C, esophageal reflux, poor nutrition, alcoholism, and tobacco abuse. Notes in his medical record described him as "emaciated" and "appear[ing] chronically ill." Laboratory evidence suggested that he smoked marijuana.

While recovering from the initial fracture surgery, Conners frequently failed to follow medical directions. He smoked cigarettes despite being told to refrain, he bore weight on his leg despite being instructed not to, and he misbehaved in other ways typical of mentally-compromised, noncompliant patients. State Farm seized on this evidence, using it to construct a novel argument that because Conners' negligence in caring for himself contributed to the nonunion of his fracture, this complication did not "arise out of" the auto accident with Rojas.

The circuit court adopted State Farm's argument, ruling that "[p]lainitffs did not provide evidence to show a direct causal connection between the initial motor vehicle accident and the nonunion. Instead, Mr. Conners' medical records show ample instances in which he failed to comply with treatment recommendation[s] that, in turn, caused the nonunion." Because the nonunion "did not arise out of the underlying accident," the circuit court continued, neither did the complications of its corrective surgery (Conners' altered mental state and fever). The majority holds that the circuit court erred by treating the nonunion as an injury separate and apart from the intertrochanteric fracture, and I agree. The majority correctly reverses these rulings, explaining that "the nonunion was simply the failure of Conners' intertrochanteric fracture (which arose from the accident) to heal properly," and that "[t]he failure of this injury to heal is a direct result of the first injury." Because Conners' " 'first injury' (the intertrochanteric fracture) caused the 'second injury' (the nonunion) in a direct way," the majority reasons, "plaintiffs presented sufficient evidence to support a finding by the trier of fact that the nonunion of Conners' intertrochanteric fracture arose out of the October 25, 2012 motor vehicle accident."

This is the point as which I depart from the majority. To the extent the majority suggests that a jury must resolve whether the nonunion of the intertrochanteric fracture and the complications of the surgery to repair the nonunion "arose out of" Conners' accident with Rojas' vehicle, I respectfully disagree.

Once a claimant demonstrates that he sustained bodily injury that "arose out of" a motor vehicle accident under MCL 500.3105(1), whether a claimed expense is payable depends on the relationship between the expense and the *injury*. "[A] no-fault insurer is liable to pay benefits only to the extent that the claimed benefits are causally connected to the accidental bodily injury arising out of the automobile accident." *Griffith v State Farm Mut Auto Ins Co*, 472 Mich 521, 531; 697 NW2d 895 (2005). If that criterion is satisfied, an insurer bears liability for payment of those expenses that are "reasonably necessary" for treatment of the injury. MCL 500.3107(1). Thus, a causal connection between the injury and the expense must yield payment. If the injury is *a* cause of the expense for which payment is sought, payment is required (assuming the expense also qualifies as "reasonable" and "necessary").

In my view, State Farm premised its motion for summary disposition on an inapposite legal theory: that the nonunion and subsequent drug reaction did not arise out of the automobile accident. The evidence State Farm marshalled in support of this incorrect approach failed to refute that the claimed medical benefits are causally connected to the *intertrochanteric fracture*. Under § 3107(1)(a), the relationship between the fracture and the expenses, rather than between the accident and the expenses, controls State Farm's liability for benefits. Conners and Bronson demonstrated that the nonunion and the complications of surgery to repair it were causally connected to the fracture—and the majority has so found. I would hold that there is no genuine issue for trial regarding the relationship between the nonunion, the drug reaction, and the initial fracture.

III

Under the no-fault act, PIP benefits are payable (with certain exceptions) for:

> Allowable expenses consisting of all reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation. [MCL 500.3107(1)(a).]

Allowable expenses include the cost of medical care. *Heinz v Auto Club Ins Ass'n*, 214 Mich App 195, 197; 543 NW2d 4 (1995). State Farm has not challenged that the charges at issue were "reasonable" or that the services provided were "reasonably necessary."

The final phrase of § 3107(1)(a)—"for an injured person's care, recovery, or rehabilitation"—operates as the section's causation clause. Two words in that phrase determine its reach. The word "for" " 'implies a causal connection' and is defined as 'with the object or purpose of[.]' " *Admire v Auto-Owners Ins Co*, 494 Mich 10, 26; 831 NW2d 849 (2013) (citations omitted). "Accordingly, a claimant can recover as an allowable expense the charge for a product, service, or accommodation that has the object or purpose of effectuating the injured person's care, recovery, or rehabilitation." *Id*. (emphasis omitted). Our Supreme Court has highlighted that the context of the words "care," "recovery" and "rehabilitation" suggest a

relationship with the injured person's injuries. *Griffith*, 472 Mich at 534. An expense incurred for the purpose of bringing about an injured person's recovery or rehabilitation from an accident-caused injury falls within § 3107(1)(a). Once the causal connection between an expense and an injury is established, the question becomes whether the expense was "reasonable" and "necessary."

As the majority has explicitly recognized, the nonunion of Conners' intertrochanteric fracture is related to the fracture itself. A nonunion occurs when a broken bone fails to heal. Treatment of this complication was intended to restore the function of Conners' leg. State Farm raised no argument regarding the reasonableness or necessity of the charges. In my view, that should end any dispute in plaintiffs' favor, as State Farm simply cannot refute that Conners' need for surgery on the nonunion (to "care" for or "rehabilitate" him) was related to the fracture itself—the injury incurred in the accident.

State Farm insists that Conners' intertrochanteric fracture failed to unite because Conners did not follow Dr. Ellwitz's instructions regarding weight bearing, eating properly, and refraining from smoking cigarettes. State Farm has missed the relevant point. Conners' fracture arose from the accident, the care required to mend the nonunion was causally connected to the fracture, and the surgery was "reasonably necessary" for Conners' "care, recovery, or rehabilitation" from the "accidental bodily injury:" his fracture. These are the facts that create the causal relationship required for coverage.

State Farm's attempt to import the causation test stated in § 3105(1) into an analysis of whether an expense is allowable under § 3107(1) is misguided for three reasons. First, the plain language of § 3107(1) does not contemplate that a claimant seeking care for complications of an accidental bodily arising from the use of a motor vehicle must prove that each and every complication of the injury was proximately caused by the *accident*. Once a claimant's injury satisfies § 3105(1), the initial causation "test" is satisfied. The next inquiry is whether the claimed *benefit* is causally connected to the accidental bodily *injury*, see *Griffith*, 472 Mich at 531. With regard to medical bills, this inquiry includes a determination that the charge for which payment is sought qualifies as an "incurred" and "reasonably necessary" "expense" for a "service" directed at an injured person's "care, recovery, or rehabilitation." The relevant factual inquiries set forth in § 3107(1) do not include a determination that the benefit arose out of the ownership, operation or maintenance of a motor vehicle.

Second, allowing an insurance company to avoid payment of an allowable expense based on the causation theory articulated in § 3105(1) would undermine the integrity of the no-fault system . "The goal of the no-fault insurance system was to provide victims of motor vehicle accidents assured, adequate, and prompt reparation for certain economic losses." *Shavers v Attorney General*, 402 Mich 554, 578-579; 267 NW2d 72 (1978). Challenges of the causal relationship between every incurred expense and the *accident* giving rise to the involved injury would bring the first-party no-fault system to a crashing halt.

Two examples illustrate why § 3105(1) does not control benefit determinations once an accidental injury arising from a motor vehicle accident has been sustained. What if while repairing Conners' fracture, Dr. Ellwitz negligently failed to orient the bones properly, causing a subsequent nonunion? Medical malpractice is always foreseeable. *Richards v Pierce*, 162 Mich

-6-

App 308, 317; 412 NW2d 725 (1987). Should a no-fault insurer be permitted to deny PIP benefits for treatment of the nonunion, defeating the purpose of the no-fault act, based on a foreseeable event? The North Dakota Supreme Court emphatically rejected this result, explaining:

> We believe the purpose of the no-fault system to transfer victim compensation for personal injuries arising out of motor vehicle accidents from a fault-based tort recovery to a compulsory no-fault insurance would be seriously undermined if our no-fault statutes applied modified comparative fault principles to medical malpractice in treating personal injuries sustained in a motor vehicle accident. [*Haff v Hettich*, 1999 ND 94; 593 NW2d 383, 391 (1999).]

Alternatively, what if Conners' developed a MRSA (methicillin-resistant staphylococcus aureus) infection post-surgery, likely caused by poor infectious disease practices at the hospital? Indisputably, a causal nexus would exist between the accident and the infection. Opening the door to protracted litigation concerning liability for the infection would surely contradict the central tenets of the no-fault act.

Other examples amplify my point. Suppose a claimant suffers a severe facial gash in an auto accident. The gash is stitched and the claimant is instructed to keep it clean and to take an oral antibiotic. If the gash becomes infected and additional surgery is required, should the no-fault carrier be permitted to delay or deny coverage based on an allegation that the claimant did not keep the wound clean enough, or failed to take a couple doses of the antibiotic? Or suppose that a claimant fractures her wrist in an auto accident and the wrist is casted. The claimant allows the cast to become wet, necessitating its removal and replacement. Is the no-fault carrier off the hook for this expense? In these examples, patient malfeasance was the most direct cause of the expense. But because the no-fault act requires payment when the claimed benefit is causally connected to an accidental *injury* arising from the use of a motor vehicle, the patient's negligence—like medical malpractice, a foreseeable and ordinary fact of life—does not sever the relationship between an injury and the treatment required for an injured person's "care, recovery, or rehabilitation."

Finally, I find it ironic that a no-fault claimant is entitled to benefits regardless of his fault (recall that according to State Farm, Conners negligently walked into the path of Rojas's vehicle), only to be disqualified from receiving benefits if he behaves in a manner the insurer considers negligent. The no-fault act is not so easily overcome.

State Farm contends that a traditional proximate cause analysis bars Conners' recovery of benefits, as in State Farm's view, Conners' negligence was the sole proximate cause of his nonunion. But proximate cause is a fault-based concept, and in my view, fault-based legal paradigms such as proximate cause have no place in a first-party no-fault system governed by statutes rather than the common law. "It was a specific purpose of the Legislature in enacting the Michigan no-fault act to partially abolish tort remedies for injuries sustained in motor vehicle accidents and to substitute for those remedies an entitlement to first-party insurance benefits." *Stephens v Dixon*, 449 Mich 531, 541; 536 NW2d 755 (1995). In applying MCL 500.3105(1), this Court has observed: "While the intervening negligence of one party may be sufficient to defeat a claim that another party's negligence was the proximate cause of an accident in a fault

based system, the term 'arising out of' does not require as strict a showing of causation as does the concept of proximate cause." *Buckeye Union Ins Co v Johnson*, 108 Mich App 46, 50; 310 NW2d 268 (1981). Aside from the absence of any statutory language supporting the application of a proximate cause standard to the no-fault act's benefit provisions, I submit that tort principles such as proximate cause have no place in a no-fault arena.[3]

"Given the remedial nature of the no-fault act, courts must liberally construe its provisions in favor of the persons who are its intended beneficiaries." *Frierson v West American Ins Co*, 261 Mich App 732, 734; 683 NW2d 695 (2004). Broadly, the act provides that insurance companies must cover the reasonable and necessary expenses incurred to care for and rehabilitate people injured in accidents arising from the use of motor vehicles. Payment is supposed to be swift and sure, no litigation required. Fault-based concepts such as proximate cause or comparative negligence are not mentioned in the act and in my view, have no place in the administration of a no-fault system. I suggest that the initial causation standard embraced by § 3107(1)(a) is essentially one of contribution: if an accident contributes to the need for an expense, the expense is subject to coverage. Trials adjudicating allegations of comparative negligence on the part of an injured victim would contravene the letter and the spirit of the no-fault system.

IV

State Farm pins its causation argument to our Supreme Court's opinion in *McPherson v McPherson*, 493 Mich 294; 831 NW2d 219 (2013). State Farm profoundly misinterprets *McPherson*.

Ian McPherson suffered a closed head injury in a 2007 motor vehicle accident. In 2008, while driving his motorcycle, he had a seizure triggered by his head injury and crashed into a parked car. *Id*. at 295. This second accident resulted in severe injuries, including quadriplegia. *Id*. Unfortunately, Mr. McPherson did not have no-fault coverage for the 2008 motorcycle accident because he had failed to insure his motorcycle. *McPherson v McPherson*, unpublished opinion per curiam of the Court of Appeals, issued January 10, 2012 (Docket No. 299618), unpub op at 2. He instead sought no-fault benefits based on the 2007 accident, contending that his spinal cord injury "ar[ose] out of" the 2007 crash. *McPherson*, 493 Mich at 296. This Court held that it did. The Supreme Court granted oral argument on the defendant insurance company's application for leave to appeal and reversed. The Supreme Court framed the "only"

---

[3] I predict that a related legal problem will arise when State Farm's liability for Conners' benefits is submitted to a jury. Logically, if State Farm is entitled to defend based on an argument that Conners' negligence was the sole proximate cause of the nonunion, shouldn't Conners be entitled to a comparative fault instruction? Would this mean that State Farm could be held liable for only a percentage of the expenses incurred? And what about the venerated tort principle that a tortfeasor takes a victim as he finds him? See M Civ JI 50.10. The jury instruction continues: "If you find that the plaintiff was unusually susceptible to injury, that fact will not relieve the defendant from liability for any and all damages resulting to plaintiff as a proximate result of defendant's negligence."

question before it as: "whether the *spinal cord injury* plaintiff suffered in the 2008 crash 'ar[ose] out of' the 2007 accident for purposes of MCL 500.3105(1)." *Id*. (Emphasis in original.)

Plainly, the Supreme Court trained its analysis on § 3105(1), not § 3107. The Court highlighted that Mr. McPherson did not injure his spinal cord during the 2007 accident; "[r]ather he injured it in the 2008 motorcycle crash, which was caused by his seizure, which was caused by his use of a motor vehicle as a motor vehicle in 2007." *Id*. at 297-298. And although McPherson's underlying neurological disorder was caused by the 2007 accident, the Supreme Court found that "the 2008 injury is simply too remote and too attenuated from the earlier use of a motor vehicle to permit a finding that the causal connection between the 2008 injury and the 2007 accident 'is more than incidental, fortuitous, or 'but for.' '" *Id*. at 298 (citation omitted). In two sentences critical to understanding the case, the Supreme Court elucidated:

> The facts alleged by plaintiff only support a finding that the first *injury* directly caused the second *accident*, which in turn caused the second injury. Thus, the second injury alleged by plaintiff is too attenuated from the first accident to permit a finding that the second injury was directly caused by the first accident. [*Id*. at 298-299 (emphasis in original).]

*McPherson* involved two entirely separate accidents and two distinct injuries. The Court's causation analysis focused on whether the second injury (involving the plaintiff's spinal cord) "arose out of" the first accident for the purposes of § 3105. It found that an event of independent significance—the 2008 motorcycle crash—occurred between the "use" of an automobile in the 2007 accident and McPherson's spinal cord injury.

Unlike Kenneth Conners, Ian McPherson was involved in two entirely different automobile accidents. The injury to his spinal cord was not a complication of his head injury; it resulted from an entirely separate and distinct accident. McPherson nevertheless attempted to causally connect the injuries sustained in the second accident not only to those sustained in the first, but to the first accident itself. This was a bridge too far for our Supreme Court. And because *McPherson* involved two accidents and two unrelated injuries, it has absolutely nothing to do with this case.

Nor does *McPherson* gain relevance based on the Supreme Court's reference in that case to *Scott v State Farm Mut Auto Ins Co*, 278 Mich App 578; 751 NW2d 51 (2008), vacated in part on other grounds 482 Mich 1074 (2008). In *Scott*, the plaintiff sustained a brain injury in a 1981 motor vehicle accident, and received PIP benefits for her care, recovery, and rehabilitation. *Id*. at 579. In 1991, the plaintiff sought PIP benefits for treatment of high cholesterol (hyperlipidemia). Her physician attributed this disorder to "the sequelae from the auto accident." *Id*. at 580. This Court held that the doctor's testimony raised a genuine issue of material fact regarding whether the plaintiff's hyperlipidemia arose from the accident or from "a genetic predisposition," from which the plaintiff apparently suffered. *Id*. at 586. In *McPherson*, the Supreme Court characterized this Court's holding in *Scott* as follows: "summary disposition was premature because the plaintiff had raised a genuine issue of material fact whether her hyperlipidemia occurred as a direct result of an injury she had received in an automobile accident or was attributable to other factors." *McPherson*, 493 Mich at 298. The only factor mentioned—a genetic predisposition—was obviously unrelated to the head injury sustained in the accident.

*Scott* and *McPherson* required an application of § 3105(1) because both cases involved claims for the treatment of new and distinct injuries rather than claims for treatment of an indisputably accident-caused injury. Conners developed complications of his intertrochanteric fracture, not new and distinct injuries. That Conners may have contributed to those complications does not transform those complications into new and distinct accidental (or genetic) injuries. *Scott* and *McPherson* have no roles to play here, and to the extent the majority has relied on them, I submit the majority has been led astray.

Summarizing, I submit that the relevant legal question in this case is whether Conners' claims for medical benefits for the nonunion surgery and its complications was causally connected to Conners' intertrochanteric fracture. The answer is obvious that there can be no reasonable dispute about this link. I would reverse the circuit court and remand for a trial at which State Farm could contest only whether the charges made for the services were "reasonable," "incurred," and "reasonably necessary" for Conners' "care, recovery, or rehabilitation" as provided in § 3107(1)(a).

/s/ Elizabeth L. Gleicher